Case number 224020, USA v. Yanjun Xu, oral argument not to exceed 15 minutes per side, Ms. Harris for the appellate. Please remind us or let us know how much time you're reserving for rebuttal. Yes, three minutes, Your Honor. Thank you very much. May it please the court, my name is Justine Harris, and I, together with Katie Rensler, represent Yanjun Xu. There are three issues on this appeal. Two require reversal and a new trial. The third relates to the 20-year sentence imposed on Mr. Xu. I'm going to start with the Rule 704B issue. The government's espionage expert, the former CIA agent James Olsen, ran afoul of Rule 704B in that he commented directly on Mr. Xu's mental state. While his testimony is replete with examples of a pining about what Mr. Xu wanted, what he was trying to do, there are two particular egregious examples that I want to focus on. The first, at the conclusion of his- Before you focus on the particulars, I'm trying to understand what the full import of the objection was. Are you saying that there is only a portion of Olsen's testimony that you object to, that is related to intent information, and that the remainder of his evidence is unobjected to? That's correct, Your Honor. Rule 704B specifically prohibits commenting on a defendant's state of mind, mental state that's pertinent or an element of the charged offense or of a defense. The current state of the law is that, and the cases I think are fairly clear, are that an expert is allowed to testify about the techniques or the means and methods of an individual who might possess the requisite intent, but they're not permitted to specifically comment about the defendant in the particular case. And that's what happened here. Your objection listed five particular statements, and that is all that is being challenged. Correct, Your Honor, correct. There are other portions of the testimony that I think under the current state of the law would be and are permissible. It's when he veered directly into opining on intent and used certain key phrases, such as the objective that a certain email, the particular email that the government claimed was written by Mr. Hsu, that the language used in that email meant, this is a direct quote, meant that the objective was to obtain this technology from foreign countries. And when it says this technology, the email in question had the language, quote, regarding the current development situation and future development direction of foreign countries' structural materials for fan rotor blades made from composite materials, the precise trade secret that was at issue in the case. So what happened here, which I think is unique and distinct from standard law enforcement expert witnesses, is that the government chose to show seven to eight exhibits. Seven of those exhibits were WeChat communications, emails, the specific communications between Mr. Hsu and Mr. Zhang, the sort of core evidence in the case. Now, it's not improper to show experts' evidence. That happens all the time. But what happened here is that questions were then asked that were designed to elicit opinions about what those emails meant and what was going on. Council, let me ask you, as the questions were being asked, wasn't the context for those questions in looking at what constitutes tradecraft, in the tradecraft, what would this type of language mean? There were certain questions that were in the more general hypothetical sense, but there were other questions. For example, the very last statement that Mr. Olson opined at the end of his testimony was, he said, the conversations and actions of this individual, and after having been asked again about a communication that the government alleged was written by Mr. Hsu, he says, this individual are those of an intelligence officer conducting espionage. I had no question about that. Again, he had specifically defined espionage as stealing trade secrets. So once he makes that conclusory statement, he's essentially said now on repeated occasions in his testimony that this individual. Just my memory is a little foggy on what I'm about to ask you about, so clear it up for me. What was the question asked of Olson, leading up to or immediately prior to his making that response? Yes, I'm gonna, I'll pull up the exact colloquy. Thank you, because I'm trying to remember that. You're asking about the precise colloquy.  He says, so Mr. Olson, have you looked at the information relating to this GE employee and these events? Yes. Did you see aspects of espionage tradecraft in that cycle? Yes, I did. In fact, the conversations and the actions of this individual are those of an intelligence officer conducting espionage. I had no question about that at all. And then no further questions. What about the curative instruction? The curative instruction, Your Honor, was too little, too late. There were many opportunities for the district court to correct and prevent and mitigate the damage in the moment, and it chose not to do so. Was the jury expected to observe the instructions, and didn't you request that the general instruction be changed to specifically name Mr. Olson, and that was done? Your Honor, by the time, so I have two answers. One is that, and I can see that defense counsel and trial counsel below did not ask for a more robust instruction, but two things. In the moment of the objection, the court should have sustained it, stricken the relevant portions, and at that moment when the testimony was fresh, directed that the jury not consider that specific testimony. Well, there was only one objection during the course of the testimony, wasn't there? There wasn't an objection, for instance, right before the question that you just read to us, which was that final question. It actually comes earlier, Your Honor. It comes a little earlier. It comes at 40, the page ID is 4650. I will note that there are two to three objections earlier for speculation and lack of foundation, which frankly are very close cousins of a 704B objection that were all overruled leading up to those key questions. But very importantly, Your Honor, after the objection that is made explicitly on 704B grounds, there's still additional egregious rule violations. So the final statement by the expert at the very end that says this is an individual conducting espionage, had the objection been sustained and government counsel directed to ensure that that testimony doesn't come out, there would have prevented additional compounding damage. But there was no additional objection to that later testimony, right? Your Honor, at that point, the testimony, the objection had been sustained, I mean, excuse me, had been overruled. And I think trial counsel was fairly, I mean, to keep making the same objection, they've now objected on lack of foundation, no basis. Trial counsel would not be faulted for saying, I raise the same objection as to this. I have a continuing objection as to this line of testimony, Your Honor, I would like it noted on the record. Well, they did. None of that in this record. Actually, they did essentially do that. Remember, that statement is the very last statement. And I don't think it was fair to assume that that was gonna be the statement given the question asked. So any objection would have come after that last statement by Mr. Olson. And remember, then on the next business day, there's a fulsome motion to strike, laying out on paper, in detail, all the damage that was done. And again, the district court denied the motion, did not strike the testimony, did not, in that moment when the testimony was fresh, give a curative instruction. I think if this were a situation where the district court had acknowledged that there had been a rule violation, and then given, sort of made an attempt to cure it, my record would be different. But here's a situation where, when it was repeatedly raised, in the moment, in the testimony, then again on the next business day, in a motion to strike, and it's repeatedly denied, the district court says repeatedly, he's properly testifying about his opinion, he's not invading the province of the jury, I find no problem here. It's a different situation. Let me turn before your time is up to another subject. Your objection to this court's decision in the U case. At the end of 23, the United States Sentencing Commission published amendments to the sentencing guidelines, and the first one in that proposal was to move the general definition of loss from the notes, from 3A, and out of the commentary and into the guidelines. Does that not resolve this issue? Your Honor. Issuing to our presidential case in view. Well, of course, I recognize the effect of the decision in United States VU, and in reply, we just note our continuing objection. These proposed guidelines, of course, have not yet been adopted and reviewed by Congress, so that exactly the complaint about the application note is that it's an administrative agency expanding the meaning of the guidelines without congressional approval. So what is yet to happen, I think, remains an unknown. We maintain at this point very strong arguments with respect to the calculation of the $50 million of lost profits, and that there was no basis to find that Mr. Hsu here specifically intended a loss of that magnitude. To the extent we're dealing in intended loss territory, the law is clear that it has to be, and there's a very informative, helpful decision from then Judge Gorsuch in the 10th Circuit, United States v. Manitow, that there's a difference between what is intended and merely knowing that a loss may result. And it is only what is in the defendant's intent. Here, there is no specific finding that the $50 million loss calculation, which was speculative and based on a series of assumptions that had not been documented and proven at the loss hearing. Remember, the loss hearing was presented by the government as all about research and development costs. They did not advance or document or present evidence or witnesses to support the many assumptions that the district court made that China could have actually built a competing engine in the timeframe that they contemplated, that it would have been successful in the market, that it would have actually decreased 1%, which is a huge number. It's numerically a small number, one, but 1% of GE Aviation's global profits for all of its engines, when this was a very particular fan blade component for a very particular kind of engine for a very particular airplane. And the government witness at the hearing and the defense witness taken together made clear that it would have been impossible, near impossible for China, even had Mr. Xu obtained this trade secret to replicate and have a competing engine. The district court discounted that futility and made a finding that was unsupported by the evidence. Thank you very much.  May it please the court, Kevin Kohler on behalf of the United States. I'll focus my comments on the second issue and the third issue, but happy to answer any questions the court may have about the first issue. Turning to the 704B issue first, with respect to the standard of review, I think it is highly relevant that defendant did not contemporaneously object to most of the answers or questions that they complain about now. In their oral argument, I think they identified to the objective question and then the final one, they claim these are egregious violations of 704B. There was no contemporaneous objection to either of those. There's one objection to one of the questions. It was overruled. The witness proceeded to answer and there was no objection after that. And it's relevant here that the motion to strike comes, yes, the next business day. It also comes after the witness has left the stand. It's come after the government has rested its case, at which point the district court can't really go back and do things it could have done with a contemporaneous objection. What would have been your response if there had been contemporaneous objection? At trial, we would have argued that he did not cross the 704B line, which is our position on appeal as well. I think regardless, even if you view this under an abusive discretion standard, there's no abusive discretion here. If you look at the actual questions and answers, what Mr. Olson was testifying about is really that the words and the actions of you, and that last answer, I think, is telling. It says these conversations and actions are consistent with someone engaging in tradecraft. And that's the theme throughout the entire directive. Let me ask you a question because, I mean, you've said what the case law has really given its stamp of imprimatur on, which is to say it's consistent with. But that's actually not the testimony. The testimony is the conversations and the actions of this individual are those of an intelligence officer conducting espionage. And I would say of the questions and answers that have been pointed out and objected to, I think that one is the most problematic. And so it's not really posed in a hypothetical type of situation. And it doesn't have that limiting language. So considering that, I guess you've given us what your argument against it would be. But I guess I wanna hear, like, what is your best argument with respect to that statement in particular? Well, with that statement in particular, it says the conversation actions of those of an individual. I think you read of those of an individual is talking kind of about a hypothetical third-party intelligence officer. I'd also say, even if that comes close to the line, you know, if this was so egregious, if there had been a contemporaneous objection and if the district court might have said, hmm, that's a little close, strike that, try again, and we could have elicited maybe a slightly clearer answer on that question, because the question was, do you see aspects of espionage stagecraft? So I think what we're trying to do is stay within the limits of 704B. If there had been a contemporaneous objection, maybe we could have steered that. I think the other big point here is that you do have the curative instruction, which is crafted with defense counsel's input. It specifically identifies what the jury can consider and what they can't consider. They can't consider this for intent. It also goes kind of well beyond the standard curative instruction that this court has endorsed in other situations. And again, this motion to strike is coming after the close of evidence, so it's not clear what more the district court could have done, because you can't go back in time because there was no contemporaneous objection. Well, that was after the close of the plaintiff's case, right? At the close of the government's case, yes. Sorry, at the close of the government's case, then, but how long was the trial in total? The trial in total was 10 days, and then defense counsel, defense did not put on any witnesses. So I think the government rested on, I believe it was a Friday. James Olson was the final witness. The motion to strike was filed the following Monday, I believe. Which was the next business day. Which was the next business day. And they sent in- The language, correct? Yes. Why doesn't that preserve that issue so that we're in abuse of discretion? Well, the rule in this circuit is that an objection needs to be made as soon as it is known or could reasonably be known. If these were egregious violations, then they should have been known at the time the question or the answer was made. And since the witness is no longer in the stand, government's case is no longer open, these are all difficult things the district court has to wrestle with after the fact. Which is, I think, what's recognized in the D.C. in the Fifth Circuit cases we cite, saying that you can't sit on an objection throughout the direct examination and then later file a motion to strike and still preserve that for abuse of discretion. But again, I think even under an abuse of discretion, I think this still passes, this still is fine. And even if this kind of came up to the line a little bit, you have the curative instruction that's crafted with defense counsel's input. Defense counsel signs off on it. Does that, the fact that defense counsel participated in putting together the curative instruction, why are you emphasizing that? What difference does that make? Sorry, Your Honor. Only in defendant's opening brief, I think they take issue with how robust the jury instruction was and they suggest, well, maybe the jury instruction should have had something more in there. It's not clear what that more would have been and we just identify that the district court did not, did solicit input on this and gave the opportunity to defense counsel. I agree, it's not determinative. What really matters is the text of the jury instruction and the text of the jury instruction here goes beyond what was even kind of identified in Schaefer. If there are no additional questions on the 704B, I'll turn briefly to the loss calculation issue. The one thing I did want to highlight is that the district court did make a specific intent finding. In fact, if you look at the loss calculation order, which is in the record at 208, he devotes, it devotes several pages to this. Amongst other things, the district court states quite simply defendant's intent was to steal profits out of GE Aviation's pocket and place those profits in China's pocket instead. That's at 5229. The next page at 52030 says the government presented evidence at trial that proved beyond a reasonable doubt that defendant did attempt to intentionally harm GE Aviation by obtaining GE Aviation's intellectual property on behalf of China. The opposing counsel objects to the calculation. It is a substantial number. What is your best argument for why it was an acceptable calculation methodology that the district court approved? It is a substantial number, but this is also a substantial economic espionage or attempted economic espionage. I think what's relevant here is. And I agree with that. The question is, the punishment here is for the specifics. The loss calculation is for the specifics. And that really does not depend upon the position of this individual. It depends on what he did in this case and what harm could have been engendered by what he did in this case. So what makes it work here? What makes it work here is that the intended loss here is enormous. What he intended to do was to take GE's profits and move them into China's pockets. And I think what's relevant for the district court's order specifically is that at every turn it drew the inferences in defendant's favor. I think the number, the true intended loss number is probably much higher. And the district court actually says this, that the true intent here is to capture all of GE's profits. But what the district court does here, at every turn it kind of draws the inferences in defendant's favor. For one thing, it's only looking at GE's lost profits. Their record is replete with instances where they're targeting other aviation companies as well. It only looks at one year of profits, right? I think there's no doubt that if China had been successful they would not have stopped making the commercial engines after one year. There's testimony that- The opposing counsel objects to using lost profits as a conceptual basis because of the difficulty and the speculation that is required to assume that they would get this and that they would then be able to manufacture on their own and all of the contingencies is what your opposing counsel's objection is to. Why isn't it too contingent to use that method? So two points on that. First, I would note this court in you specifically blessed the idea of lost profits rather than lost revenue citing to here. Here it's not too contingent because amongst other things, it only takes 1% of the profits. It only takes one year of the profits. It only takes GE's profits. It excludes the systems and other segments which would have included an additional 4.3 billion in revenue. So there is some reasonable estimation going on here, but taking 1% of those profits I think is calculating in all the possibilities that maybe it doesn't go as planned. Maybe it isn't perfect. The other thing I would note is the loss here is what is the intended loss even if there might be some future obstacles down the road, even if there is some possibility that it won't fully succeed. I know in the reply brief, defense counsel cites to McBride and says, well, look, you need to consider whether this was an overly ambitious scheme. I guess there are a couple points to make on that. One, this is not an overly ambitious scheme. This is a spy backed by the full weight of the Chinese government backed by China's best experts. McBride also says that kind of economic reality test doesn't actually have a place in loss calculation anymore since 2000. The economic reality test only comes in if you're looking for a downward departure, but it doesn't go into the guidelines test. What McBride does say is there's a misperception of facts test, which can impact the loss calculation, but that misperception of facts is really where you have a defendant who is a fundamental break from reality. And the example of the McBride court uses is a defendant spray paints on the side of a federal building. The U.S. loses all its gold and expects Fort Knox to be emptied of its reserves. That's a case where you could consider that to be a misperception of facts and it doesn't go into loss calculation. The economic reality test actually only goes to a downward departure and we don't think that's even met here. And again, going back to your specific question, Judge Strange, is the fact that you've taken 1% of the profits, the fact that you've limited it to just one year, where in fact the intent was to capture the full amount of the profits for as long as China could keep building the engine, I think makes this a reasonable estimate. Unappealed, under this court's case law, defendant has to show it's not only inaccurate, but outside the realm of permissible calculations. I do not think the court's opinion here is certainly within the realm of permissible calculations and is a very reasonable estimate given the evidence at trial. If there are no further questions, we'd rest it on a brief and ask this court to affirm. Well, this is perhaps, and counsel maybe will want to address this on rebuttal, she did not get an opportunity to talk about her claims of duplicitousness, and so if there's anything that you'd like to highlight for us in your response to the claims of the duplicitousness of counts one and two, give me that opportunity. The one thing I do actually have is a key point to highlight. I know in their reply brief, they cite to a page of the indictment saying, well, look, the agreement here was actually trade secrets and additional stuff. That citation is to the first page of the indictment. It's the background page where they're simply discussing the defendant's job duties. The relevant language in the indictment is in counts one and two, which is on page five and page 13. They both make clear that there was a single conspiratorial agreement alleged in each of these counts. That agreement went from 2013 to 2018. Within the duplicity analysis, it is important to note also that this, the evidence at trial is not relevant, that it's a face of the indictment analysis. The face of the indictment here clearly alleges a single conspiratorial agreement. We'd also note that there was no claim of a variance at trial or on appeal, no claim that the evidence actually showed multiple conspiracies rather than a single conspiracy defense counsel. They thought that was the case. The end of trial could have asked for pattern instructions 3.08 or 3.09, which would go if they thought there was a variance. And then lastly, the evidence itself, as we point out in our brief, is consistent and shows one ongoing conspiracy. This is Gee working with other members of the MSS on an almost daily basis to specifically target trade secret information. If you look at the evidence, it is all going to the idea that they're after something that's not public information. They're using aliases, they're using codes when they're talking about Honeywell's information. They're trying to do cyber intrusions on these visiting experts. They're pushing these experts in a manner consistent with the recruitment cycle. All this is showing it's not the publicly sourced information they're after. What it's showing is they're after the actual trade secrets and it's a one ongoing conspiracy from 2013 to 2018, as alleged on the face of the indictment, Your Honor. Thank you. Since I opened the door on the duplicity, maybe you'd want to address that first, particularly the point that counsel makes that there's been no claim, there was no claim at trial that there was a variance at the close of the proofs or anything, or at the end of trial. So maybe you want to start there. Yes, Your Honor. It's a complex argument that we're making and it's really a duplicity and evidentiary argument together. At trial, as we detail at length in our briefs, there were seven different witnesses that testified over a course of days about three different transactions that we submit had nothing to do with trade secrets and nothing to do with GE Aviation. The Saffron intrusion, Mr. Lee, and Mr. Arthur Gao, the Honeywell employee. They're separated in time from the events, the central events in question. That evidence is unclear from the record, as we note exactly on what grounds that evidence was admitted. However, we make clear in our brief that under either ground, either direct evidence of the conspiracy or as 404B, that admission was improper. If it came in as direct evidence, which I think is how fairly read the record reflects the parties treated it. If it came in as direct evidence of the conspiracy, that was possible only because the government was allowed to proceed on an impermissibly duplicitous charge. We don't just cite the first paragraph of the indictment. There's subparagraph H in the manner and means that talks about it was further part of the conspiracy that Sue and others paid such experts to provide technical information regarding aviation technology, including trade secret information. That the substance of the overt acts going back to 2013 and expert exchanges broadened the conspiracy to not just be about trade secrets, but about any attempt to get technical information. James Malvin on the government's experts says there are many ways to do that. There are legal ways to do that. You can do that through other criminal acts, such as obtaining export controlled information or breaking into computers. All of that evidence was really to the extent it was a properly non-duplicitous indictment. That evidence came in as 404B improperly. There was no curative instruction. The standard bedrock things that district courts do when they admit 404B evidence is to do a 403 balancing analysis and to give a curative instruction. They did not do that here. I did wanna, I'm happy to answer any questions, but I did wanna respond quickly to some of the issues on the other two points that the government attorney raised. Just with respect to preservation, the standard in this circuit is that an issue is preserved when the litigant states the issue with sufficient clarity to give the court an opposing party notice that it is asserting the issue and some minimal level of argument to support it. When you take the record in whole here, I think it's fair to conclude that this issue was amply raised. There was lack of foundation, speculation and objections. There was a specific 704B objection. All of the cases cited by the government with respect to motions to strike being insufficient, those are situations where there was nothing at the time of the testimony, no objection. That is not the case here. Alternatively, given what a significant piece and evidence this was for the government, this is not, this would satisfy plain error review. And I just wanna briefly talk about what makes this testimony uniquely damaging and prejudicial. Harris, I know there's one other thing that you wanted to get to. And so maybe if you could quickly do that and then quickly address your final question. Sure, with respect to the loss issue, Your Honor, the question is a reasonable estimate. The law puts limits on what constitutes a reasonable estimate. Can't be speculative and there must be specific and reliable evidence to support a finding of loss. The court ran a file of that here and I've detailed in our opening and in our briefs all the many speculative assumptions that were made. If this had been a situation where the government at the loss hearing, there was an ample, there was a full hearing scheduled, had offered a witness from GE Aviation to talk about profits, to explain their financial statements, to say this part of our profits is based on this kind of engine and that's why we think that the conduct here would have taken away our profits in this amount. We would be in a different situation. But that's not what happened here. The district court took the financial statement and made some guesses. And I'm not, it's a difficult job, I understand, but the district court here chose 1% arbitrarily. That's a big number. 1% is not giving the benefit of the doubt. If we took 1% of Apple's profits, that would be a huge number, 1% of GE Aviation's. He also assumed that the company-wide profit margin, which he determined to be 20%, would be the profit margin applicable to this particular, to commercial aircraft engines. There was a series of speculative assumptions that had they been changed, even if it had been 0.05% instead of 1% of the profits, if the profit margin for that particular unit of engines had been 10% instead of 20%, that would have substantially lowered Mr. Hsu's guidelines. We recognize that it's very, this is a hard calculation to do. But what I think your honor mentioned this problem is that the loss guidelines are there to make specific findings about economic loss. To the extent there were other factors in this case that warranted a punitive sentence, which is what Mr. Hsu got, there are other provisions of the guidelines. There's the 3553A factors. The question here is whether the intended loss, which is a very specific provision that the law gives very specific guidance about was an appropriate basis to enhance his sentence by such a degree. We submit it's not, that it was an unfair sentence and the calculation was speculative and lacked support in the record. Any other questions? No. Thank you very much, your honor. All right, thank you very much. The case will be submitted.